### ELI LILLY & CO. v. WM. R. WARNER & CO.

(Circuit Court of Appeals, Third Circuit. September 30, 1921. Rehearing Denied January 16, 1922.)

No. 2633.

1. **Trade-marks and trade-names and unfair competition ⏀3 (4)—"Coco-Quinine" held descriptive, and not valid as trade-mark.**

"Coco-Quinine," used as the name of a liquid medicinal preparation having quinine sulphate as its therapeutic agent, with an ingredient to disguise its bitter taste and chocolate syrup used as a coloring and flavoring medium, held not subject to exclusive appropriation as a trade-mark, being merely descriptive of the contents of the mixture.

2. **Trade-marks and trade-names and unfair competition ⏀70 (1)—Simulation of another's product held unfair competition.**

Complainant made a liquid preparation of quinine with the bitter taste disguised and colored and flavored with chocolate. Through salesmen it was submitted to physicians, who came to prescribe it, and their pre-

---

⏀For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

scriptions were filled by pharmacists to whom it was sold by complainant. Later defendant began to make the same preparation, as it had the right to do, and though it did not sell its preparation as complainant's, it carefully selected a chocolate which gave it the same flavor and color, and by representing that it could be used in filling prescriptions for complainant's "coco-quinine," and selling at a lower price, it induced pharmacists to buy and use it for that purpose. *Held,* that by such conduct defendant made itself a party to the deception of ultimate purchasers, and was chargeable with unfair competition, and that to prevent such deception it should be enjoined from using chocolate in its preparation.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

Suit in equity by the Eli Lilly & Co. against Wm. R. Warner & Co. Decree for defendant, and complainant appeals. Reversed.

For opinion below, see 268 Fed. 156.

E. W. Bradford, of Washington, D. C., for appellant.

Francis Rawle and Joseph W. Henderson, both of Philadelphia, Pa., and Roger S. Baldwin, of New York City, for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. The issues in this case are unfair competition and infringement of a common-law trade-mark. We shall give just enough of the facts to disclose the controversy and make clear our decision, referring to the opinion of the trial court reported at 268 Fed. 156 for a statement in detail.

[1] The plaintiff, Eli Lilly & Company, a corporation of Indiana engaged in the manufacture and sale of pharmaceutical products, put upon the market in 1899 a compound called Coco-Quinine. It is a liquid preparation containing quinine as its therapeutic agent; yerba-santa, used to disguise the bitter taste of quinine; and chocolate syrup, used as a coloring and flavoring medium. The plaintiff built up a large trade in the product by having its salesmen first call upon prescribing physicians and explain its merits, and then by selling it to druggists, who retailed it to customers on physicians' prescriptions and on their own demand. The formula is not patented.

The defendant, Wm. R. Warner & Company, a Pennsylvania corporation, was organized in 1908 to take over the long established business of William R. Warner & Company, pharmaceutical and chemical manufacturers. The defendant corporation, Pfeiffer Chemical Company and Searle & Hereth Company are under one ownership and control. In 1906 the Pfeiffer Chemical Company put on the market a compound which it called Quin-Coco, being identical in color, taste and composition with the Coco-Quinine of the plaintiff. Later, Quin-Coco was manufactured by the Searle & Hereth Company and distributed by Wm. R. Warner & Company, the defendant. In competing for the trade of retail druggists the defendant did not pass off its Quin-Coco as Coco-Quinine but offered it on the representation that it is the same as Coco-Quinine and could be used as a substitute for it.

By its bill of complaint, the plaintiff avers that its Coco-Quinine was the first liquid preparation of quinine sulphate with the taste of qui-

nine disguised, and the first of many similar preparations (afterward put out) to be colored and flavored with chocolate, and prays an injunction against infringement of its common-law trade-mark and against the defendant's practices of unfair competition, claiming in effect the sole right to use chocolate as the distinguishing agent of its product. The court resolved the issue of unfair competition against the plaintiff on the ground that, as that concern does not manufacture its product under a patent, and as it has no exclusive right to the use of its formula or to any of its ingredients, the preparation may be made by anyone who, in good faith, acquires knowledge of its composition, and may be sold in open commerce on his representation that it is the same as the plaintiff's preparation. Hostetter v. Fries (C. C.) 17 Fed. 620. Thereupon, the court held that the defendant did not engage in unfair competition in using chocolate for the color and flavor of its preparation. It also held that the plaintiff had acquired no common-law trade-mark in the words Coco-Quinine, they being merely descriptive of the contents of the mixture, and that, in consequence, it could not complain when the defendant used practically the same words transposed to describe the same things. On the dismissal of the bill the plaintiff took this appeal, raising here the same questions that were tried below.

We find ourselves in accord with the learned trial judge on the issue of trade-mark infringement. Although the plaintiff conceived the name Coco-Quinine and gave it a substantial commercial value (as evidenced by the large trade built upon it as well as by its almost literal appropriation by the defendant), the name is, nevertheless, but descriptive of the ingredients in the compound and, therefore, cannot become the subject of trade-mark. Nor do we find ourselves at variance with the learned trial judge on the law of unfair competition, argued by counsel with great elaboration. We are constrained, however, to differ with him on the application of the law to what we regard as the controlling facts of the case. While these facts are many, they go to a matter that greatly narrows the area of the controversy and calls into operation but one principle of law. They are briefly as follows:

[2] The defendant, realizing that the plaintiff had no exclusive right to the formula of its preparation, duplicated it by a preparation of its own and offered it to the trade in competition, as it had a right to do. But the trouble is with the manner in which it did it. The defendant first procured samples of the plaintiff's preparation. Learning its ingredients, it then proceeded to make the same preparation. Its efforts were expended not so much in making a compound that would act like that of the plaintiff as they were in making a compound that would look like it and taste like it. It did not show the concern for the use of chocolate as a medium of color and taste that it showed in finding a chocolate that would give to its mixture the color and taste of the plaintiff's. In its laboratory it conducted experiments with chocolates of different kinds in an effort to get the precise color and taste derived from the chocolate used by the plaintiff. For a time it was not successful, but eventually it succeeded. It then placed the product on the market. It did not send its salesmen to prescribing physicians, presenting to them the merits of the preparation and soliciting their favor

in prescribing its use as did the plaintiff, but it sent its salesmen directly to druggists, the retail dealers, and represented to them that its new product, Quin-Coco, is the same as the plaintiff's Coco-Quinine (referring to the latter by trade-name and maker's name); that when Coco-Quinine is prescribed by a physician or asked for over the counter by a customer, Quin-Coco could be "substituted without detection" and "without anyone being the wiser." Salesmen would at times pour both mixtures on paper to demonstrate the identity of colors. To induce druggists to make purchases, the defendant represented that substitution of Quin-Coco for Coco-Quinine was not only practicable but profitable because Quin-Coco was cheaper.

We find this practice of the defendant's salesmen fully established by the evidence of an unusual number of witnesses, and that the practice, followed by its salesmen with the sanction of their superiors, was so general that the defendant is charged with knowledge of it and is, accordingly, answerable for it in the measure prescribed by law. This measure turns on two questions:

The first question is one of fact,—whether it is fraud for a druggist to substitute a drug for the one called for by a physician's prescription or by a customer directly. That substitution of drugs is fraud upon the consumer, who, from the very nature of the transaction, is helpless to protect himself, is so obvious as to require no discussion. For the protection of those who are exposed to the dangers of such fraud, courts will exercise to the utmost all the resources of the law. We have no doubt that the substitution of Quin-Coco for Coco-Quinine extensively practiced by druggists amounted to fraud and of the same opinion were a number of the very druggists who practiced the deception. This then was fraud, but it was the fraud of druggists.

The next question is one of law,—whether in counseling such fraud and in supplying the means with which to effect it (that means being in itself quite innocent) the defendant also was guilty of fraud. Put in this way the question is not whether the defendant can be held responsible for the fraud of third parties, the ultimate sellers (Hostetter v. Fries [C. C.] 17 Fed. 620), but it is whether in counseling fraud and in supplying an innocent means with which to bring it about the defendant has itself committed fraud. This question turns not alone on the character of the means. Admittedly the plaintiff has no monopoly in its formula nor has it an exclusive right to the use of any of its ingredients. This leaves the defendant and everyone else free to duplicate the plaintiff's preparation and enter the trade in competition, if, in so doing, they do not infringe the right of consumers not to have passed off on them the product of one maker as the product of another. This right resides in the public without regard to whether the party for whose goods another product is passed off has or has not a monopoly in them or an exclusive right to use certain of their distinguishing ingredients. A customer has a right to get what he calls for and pays for. If the effect of a practice is to deceive an unwary customer and lull him into the belief that he is getting what he asked for when in fact he is getting something else, the practice is illegal because a fraud upon him. And this is so (certainly where, as in this case, the purpose

as well as the effect was to deceive the consumer) even when the dress or get-up of the substituted preparation is open to use by everyone. Thus in the case of Lever v. Goodwin, 57 Law Times Reports, 583, 4 R. P. C. 492, the plaintiffs put their soap into wrappers of imitation parchment paper (which was then not a common thing), and printed (which was unusual) some letterpress on it in spaced or broken type. The defendants put up their soap in wrappers of imitation parchment paper, and they also printed on the wrappers letterpress in spaced or broken type. Their letterpress was quite different from the plaintiffs', and the defendants' name appeared in capitals four times among the letterpress, but the court found that though the printing was wholly different, the effect of the get-up was to mislead the customer, and held the practice unlawful notwithstanding the plaintiffs had no monopoly either in the kind of paper used as a wrapper or in the style of printing appearing upon it. Of like opinion was the court in Coco-Cola Co. v. Gay-Ola Co., 200 Fed. 720, 119 C. C. A. 164 (C. C. A. 6th.), where the defendant used the free agent of caramel to simulate the color of the preparation it was imitating. These English and American decisions are authority not only for the law that the innocence of the instrument of fraud does not per se avoid unfair competition but also for the law that in supplying the instrument (with similarities which singly would not be unlawful) the defendant cannot avoid responsibility for the part it took in the fraud committed—or completed—by the other. In the Lever Case the retail dealer was not deceived in purchasing the product. Neither was he deceived in the Coca-Cola case; nor in this case. The dress of the product in each case as it went to the dealer was entirely distinctive. The evident purpose in each case was to deceive, not the retail dealer, but the ultimate consumer. For the consumer in this case the preparation was rebottled. To him it came, not in the distinctive dress in which it reached the retail dealer, but naked. The only mark it had was that of color, which (as in the Coca-Cola case) the defendant labored to make non-distinctive. Having counseled fraud upon the ultimate consumer and having put in the hands of the retail dealer the means of committing the fraud, there is no room for the defendant to shift the blame to the retail dealer and no ground for the defendant to say that it is not answerable for the part which it itself played in the deception of the consumer. Certainly the defendant was an accomplice, if not the principal, in the practice. Lever v. Goodwin, 57 Law Times Reports (N. S.) 583, 4 R. P. C. 492; Coca-Cola Co. v. Gay-Ola Co., 119 C. C. A. 164, 200 Fed. 720; Garrett v. Garrett, 24 C. C. A. 173, 78 Fed. 472, 476 (C. C. A. 6th); Royal Co. v. Royal, 122 Fed. 337, 345, 58 C. C. A. 499; Kalem v. Harper, 222 U. S. 55, 63, 32 Sup. Ct. 20, 56 L. Ed. 92, Ann. Cas. 1913A, 1285, 38 Cyc. 778, notes; Cutler on "Passing Off."

With unfair competition thus established, we think an injunction should issue restraining the defendant, directly or indirectly, from inducing and enabling retail drug dealers to substitute Quin-Coco for Coco-Quinine. But it is said that such an injunction would deprive the defendant of using, as a coloring agent, an ingredient admittedly free to everyone. That is true, but, as we are deciding this case on

conduct rather than on chocolate, we think the defendant has forfeited its right to the use of chocolate as a coloring agent because of its misuse; namely, the double fraud upon the public and a competing producer. That the defendant may no longer derive advantage from its own fraud by resort to an ingredient the use of which otherwise is lawful, we direct the court below to award an injunction restraining it hereafter from using chocolate as a coloring matter in its preparation named Quin-Coco. The only practical way of protecting the public and the plaintiff from a continuance of its unfair practices is to deprive the defendant of the ingredient by which alone it made those practices effective.

It should be noted that by this decision the plaintiff is not given a monopoly in the use of chocolate. Therefore the injunction restraining the use of chocolate in a liquid preparation where the taste of quinine is masked will extend only to the defendant whose practices with reference to it have been unlawful. We are not adjudicating the acts and responsibility of other makers of similar preparations, for with respect to them we have not been informed of wrongdoing.

The decree below is reversed with costs.

## Petition for Rehearing.

PER CURIAM. This action, vigorously contested, resulted in an immense record. The testimony was directed to various aspects of the case arising from the rather technical law of trade-marks and the much broader law of unfair competition. In analyzing the testimony and distinguishing the law we have been greatly aided by counsel for both parties. Their industry in collecting the evidence and their thoroughness in discussing the law were of such high order and so equally balanced that our labors have been lightened. That our decision finally turned on an aspect of the case which caused others to pass out of view was due to no fault or omission of counsel for the respondent, but to the controlling importance which the court gave the testimony in this regard. By the respondent's petition for a rehearing, we have not been shown that we have mistaken this testimony or misinterpreted its imputations, nor have we been persuaded that we have erred in our deductions. We believe that a rehearing would produce nothing more than a repetition of the able argument already made. We are constrained, therefore, to deny the petition for rehearing.