THE COCA-COLA COMPANY, a corporation of the State of Delaware,

*vs.*

HAPPINESS CANDY STORES, INC., a corporation of the State of Delaware.

THE COCA-COLA COMPANY, a corporation of the State of Delaware,

*vs.*

LOFT, INC., a corporation of the State of Delaware.

*New Castle, June 6, 1933.*

*Hugh M. Morris,* and *Edward S. Rogers* and *James F. Hoge,* both of New York City, and *Harold Hirsch, Frank Troutman* and *Roy S. Jones,* all of Atlanta, Ga., for complainant.

*Aaron Finger,* of the firm of Richards, Layton & Finger, and *Arthur F. Driscoll,* of the firm of O'Brien, Driscoll & Rafferty, and *Benjamin Pepper,* both of New York City, for defendants.

THE CHANCELLOR: There is practically no dispute in these cases upon material matters of fact. The uncontradicted evidence shows that substitutions were made by employees of the defendants of a product other than Coca-Cola for that beverage when calls for the same were made at the Loft and Happiness, as well as at the Mirror stores. The fact that the customers who made these calls for Coca-Cola were investigators in the employ of the complainant is of no material significance. While it has been indicated in some cases that the testimony of specially employed investigators who gather evidence through "trap orders," should be accepted with caution and viewed with a certain degree of suspicion, yet testimony from such sources is not to be summarily rejected. *Hennessy, et al., v. Wine Growers' Ass'n.,* (D. C.) 212 F. 308; *Penn Oil Co. v. Vacuum Oil Co.,* 60 App. D. C. 96, 48 F. (2d) 1008. Where, as here, the facts testified to by the complainant's investigators are in no wise challenged either by direct evidence or by any circumstance other than the mere fact that the witnesses were employed by the complainant to investigate the defendant's behavior, there can be no possible justification for the court's refusal to lend credit to the witness-investigators. While no one relishes the thought of sending out persons to "snoop" upon another, yet the very necessity of the case in such matters as this

almost impels reputable men to resort to that sort of thing as a protection against the unfair tactics of a suspectedly dishonest competitor. I saw the complainant's investigators on the witness stand. They were all young men who, without exception I believe, were law school graduates. The impression they made upon me was such that I feel perfectly safe in accepting their testimony as true in all respects.

So that I must find as a fact that substitutions of some beverage other than Coca-Cola were made by employees of the defendants upon calls made for Coca-Cola under the circumstances shown by the evidence.

How many substitutions were made? There were as I recall about one hundred and thirty stores operated by the defendants (all under Loft's general management) in the area covered by the investigators. Four of the complainant's investigators made a preliminary survey of the stores shortly after the sale of Coca-Cola therein had been discontinued. The investigators ordered Coca-Cola. The summary of their testimony covering this preliminary survey, made by the solicitors for the defendants, shows that out of three hundred and twenty-four calls made for Coca-Cola, the investigators were informed in two hundred and thirty-seven instances that Coca-Cola was not sold in that store any more, and in eighty-seven instances a substituted drink resembling Coca-Cola in appearance was served. The investigation thus made extended between October and December, 1931. After this period of preliminary investigation was concluded a more intensive investigation was inaugurated extending from January into April, 1932. The investigators who worked during this later period appear to have concentrated their efforts upon the particular stores in which the first group had succeeded in securing substitutions. Those stores in which explanation had been made that Coca-Cola was no longer served, appear to have been avoided by the second group

of investigators. Furthermore it appears that when an investigator found a waitress or dispenser who would substitute some other beverage for Coca-Cola, that is to say substitute Pepsi-Cola, the investigators generally managed in their subsequent calls to place their orders with such waitress or dispenser. I gathered the distinct impression that while the investigators were truthful in their statements, yet they so planned their work as to build up the strongest showing possible to support the theory of their employer, the complainant, that substitutions were extensively practiced in the defendants' stores.

The complainant's solicitors have compiled on a chart the total number of substitutions, which they say the evidence discloses, of Pepsi-Cola for Coca-Cola. According to that chart, there were six hundred and twenty substitutions made in forty-four stores by forty-one soda dispensers at fountains and fifty-nine waitresses at tables. The total number of soda dispensers employed by the defendants is about eight hundred, and the total number of waitresses, well over one thousand. It is to be noted that in the total of six hundred and twenty substitutions above stated, as many as twenty-two and twenty-four were obtained from each of two waitresses respectively, as many as thirty-four from two waitresses, and, without multiplying details, while only one substitution was obtained from a single dispenser or waitress in thirty-two instances, in the remaining cases of the sixty-eight other dispensers and waitresses the repeat orders ran all the way from two up to twenty-four.

The significance of the foregoing figures is that they show that the investigation, however truthful the witnesses may be conceded to be in their recital of its results, was apparently somewhat partisan in its conduct, for out of eighteen hundred dispensers and waitresses, only one hundred were culled out who were found to be willing to practice substitution, and the investigators concentrated to a more or less degree upon that group.

The six hundred and twenty substitutions before referred to ought not in fairness to be regarded as that high. This is because, if two or three investigators were together and substitutions were made in response to their orders, the two or three should be regarded as joint and therefore as one. If this rule were applied, the number of substitutions referred to would be less.

It is pointed out that the investigation soon revealed that less success was realized in securing substitutions of Pepsi-Cola for Coca-Cola by dispensers at the fountains than by waitresses. The testimony shows that about ninety-nine per cent. of the demand for Coca-Cola is made at the fountains. If the investigators had not placed their orders with the waitresses at tables, the percentage of success in securing substitutions would in all probability have been far less. That is probably true, especially in view of the fact that the orders were frequently placed at the busy hours of the day when waitresses were pressed with their duties of serving food at tables.

In addition to the testimony above referred to by which six hundred and twenty substitutions are shown to have been made by one hundred dispensers and waitresses in forty-four stores during the preliminary and more intensive investigation, the complainant has shown by the testimony of forty-seven ex-employees, taken by deposition, that substitutions were practiced by one hundred and twelve ex-employees in fifty stores controlled by the defendants. There is no way of telling whether any, and if any, how many of these ex-employees are included in the one hundred dispensers and waitresses above referred to.

If a merchant substitutes one competing product for another in response to a call for the latter by a customer, the palming off constitutes not only a fraud upon the customer but as well constitutes a wrong to the manufacturer whose product was called for. The manufacturer who is the victim of this wrong is entitled to injunctive

relief against its recurrence. *Enoch Morgan's Sons Co. v. Wendover, et al.,* (*C. C.*) 43 *F.* 420, 421, 10 *L. R. A.* 283; *Samuel Bros. & Co. v. Hostetter Co.,* (*C. C. A.*) 118 *F.* 257; *N. K. Fairbanks Co. v. Dunn,* (*C. C.*) 126 *F.* 227; *Eli Lilly & Co. v. Wm. R. Warner & Co.,* (*C. C. A.*) 275 *F.* 752; *Penn Oil Co. v. Vacuum Oil Co.,* 60 *App. D. C.* 96, 48 *F.* (2*d*) 1008. The mere act of substituting another product for the one called for, without a word of accompanying misrepresentation, is enough in itself to constitute unfair trading, for as observed by the court in *Enoch Morgan's Sons Co. v. Wendover, et al., supra,* "acts speak louder than words" and the act of offering one product in response to a demand for another competing one "is, though done silently, a positively unlawful act. * * * Its unlawfulness consists in an attempt to steal away the business of the complainant for the benefit of" his competitor.

A necessary element in all unfair trade cases is the fraudulent intent of the defendant. The manner in which such intent may be shown varies with the nature of the unfair practices complained against. If the case is one where infringement of a properly registered trade-mark is shown, a wrongful or fraudulent intent is presumed; but in other cases lying in the same general field of unfair trade practice and competition, a wrongful intent in fact must be shown or justified by inference as the inevitable consequence of the act or acts complained of. *Elgin Nat'l. Watch Co. v. Illinois Watch Co.,* 179 *U. S.* 665, 21 *S. Ct.* 270, 45 *L. Ed.* 365.

Where a substitution of one article is made in response to a demand for another, it is of course possible that the act may be shown to be referable to an innocent mistake and therefore free from culpability. But in the instant case, the evidence is such that it is impossible for me to attribute the substitution to mere mistake. They appear to me to have been deliberate. There was a specific intent to substitute.

But this intent was the intent of the clerks and subordinate employees of the defendants. Will the law as a matter of course conclusively attribute to the corporate employers the intent thus revealed by their clerks and minor employees? That is the real question in this case.

The proposition is of course a general one that a principal is responsible for the acts of his agent done in the course of his employment. As I read the cases, however, the law refuses to apply that general principle so far as to hold that a fraudulent intent to injure another in his trade will be conclusively presumed against an employer from the acts of a clerk. The principle may be deduced from the cases I think, that if it is shown that clerks or salesmen engage in acts which constitute unfairness in trade towards another, a *prima facie* case for an injunction is made out against the employer. The burden is thrown upon the defendant employer to rebut the presumption thus raised against him, and if he can exculpate himself by showing that he was entirely innocent of any participation in the wrong or connivance in its perpetration, injunctive relief against him will be refused.

This view I am aware is contrary to the authority of the English case of *Grierson-Oldham & Co., Ltd., v. Birmingham Hotel & Restaurant Co., Ltd.,* 18 R. P. C. 158, where it was held that as a corporation acts through agents and as the waiters of the defendant were its agents acting for it in its restaurants, the acts of the waiters in substituting a wine not made by the complainant on calls from customers for complainant's wine, were attributable to the defendant with all their inculpating intent, and that the *bona fide* attempt of the defendant, by appropriate orders in that behalf, to prevent its employees from resorting to any such trickery constituted no excuse, and that an injunction should issue against the employer-defendant.

The Scottish case of *Montgomerie & Co., Ltd., v. Young Brothers,* 21 R. P. C. 285, overruling 20 R. P. C. 781, is an

authority directly opposed to the English case just referred to. In the case against *Young Brothers,* Lord Justice Clerk observed with respect to a case simply of a servant violating accidentally or otherwise the instructions of the master by substituting one product for another in violation of the complainant's rights—"in a case of that kind to say that the remedy is to interdict (or as we would say to enjoin) the master and punish him for breach of interdict, that is to say, for his contempt of the court which has granted it, if his servant or any servant in any of his shops should ever violate his instructions again—to maintain such a proposition is certainly not in my opinion to be accepted. The maintenance of such a proposition is not to be sustained."

The cases in this country in principle support the same view. They are to the effect that substitutions made by salesmen, though deliberate, will not be received as fixing an intent on the part of the employer where the circumstances are such as to justify the belief that the offending acts were done without the assent or in violation of the honest instructions of the employer. *Hostetter Co. v. Brunn,* (C. C.) 107 *F.* 707; *Wm. A. Rogers v. Rogers Silverware Redemption Bureau,* (D. C.) 247 *F.* 178; *Joseph Schlitz Brewing Co. v. Houston Ice & B. Co.,* (C. C. A.) 241 *F.* 817; *W. & H. Walker, Inc., et al., v. Walker Bros. Co.,* (C. C. A.) 271 *F.* 395; *Thomas Kerfoot & Co., Limited, v. Louis K. Liggett Co.,* (D. C.) 59 *F.* (2d) 80; *Bishops Pharmacy, Inc., v. Pecan Krisp Co., Inc.,* (*Tex. Civ. App.*) 53 *S. W.* (2d) 637, 639. In *Siegert v. Eiseman,* (C. C.) 157 *F.* 314, the same principle was recognized. That case was a petition to punish the defendant for contempt based on the act of a servant in making a substitution of one article for another in alleged violation of an injunction laid on the master, the court finding that the substitution, if made, was not with the approval, express or constructive, of the defendant. The petition was denied.

The cases cited by the solicitors for the complainant as bearing on the point now under examination (excepting the English case above referred to) are distinguishable. In some of them, the employer was found to have expressly authorized the practice of substitution, and in others of them the question of whether the agent's intent is conclusively attributable to the principal is not raised. In one of them (*Wamsutta Mills v. Fox*, [*C. C.*] 49 *F.* 141) the ruling is in opposition to views herein accepted, unless the fact that the case was not at the final injunction stage and the further fact that the offending act was done by a department head, would serve to distinguish the case from those I have herein cited in support of what I conceive to be the correct rule.

The weight of authority supports the view that before a corporation defendant can be held liable to an injunction because of the substituting acts of its clerks and salesmen, even though deliberate, there must be such a showing of facts as warrants the constructive imputation to the responsible officers or managers, of the servants wrongful intent, or that the acts complained of were done in obedience to instructions. In *Bishops Pharmacy, Inc., v. Pecan Krisp Co., Inc., supra,* the court went the length of saying that the substitution must appear to be such as would show the intention of the alleged offender "to adopt a course of dealing with its customers of substituting" one product for the other. I do not stop to consider whether this statement does not exact too great a degree of proof. I quote it only to emphasize the point that the element of fraudulent intent on the part of the employer is a requisite fact to be persuasively shown before the consequences of wrongful behavior on the part of his servants may be fairly and justly imputed to the employer in such cases as we are now concerned with.

Now when I come to look at the uncontradicted evidence which the defendants have produced as bearing on the question of their innocence of any wrongful attitude

or purpose towards the complainant in respect of the matter complained against, there can be only one view to take of it. That view is that the defendants took every reasonable precaution that could be expected of them to guard against any wrongful interference with the complainants enjoyment of the good-will which it had built up around its product of Coca-Cola. When the defendants discontinued the sale of Coca-Cola and embarked upon a program of exploiting Pepsi-Cola, they undoubtedly did all they could to popularize and enlarge the sale of the newly introduced product. This of course they had a perfect right to do in every legitimate way that was available to them. That they boosted it by talk and advertisements within the stores is clear. At the same time, however, they took measures, which ought in reason to have been completely effective, to instruct all their eighteen hundred dispensers and waitresses in no case to substitute Pepsi-Cola for Coca-Cola when the latter was demanded. These instructions were conveyed in several bulletins and in talks to the employees at their regular stated meetings. It was somewhat ding-donged into their ears, that if a customer ordered Coca-Cola, he was to be informed that the store no longer sold Coca-Cola, but that a new drink—Pepsi-Cola —was sold which, the assurance was to be given, is superior to Coca-Cola, and the customer was to be asked to try it and if it was not satisfactory in every way, no payment need be made for it. At the same time all Coca-Cola advertisements and displays were removed from the stores, being replaced by Pepsi-Cola advertisements. To make certain that no dispenser or waitress could by negligence remain unaware of the defendants' instructions as above summarized, every one of the employees was required to sign a written pledge to obey the instructions as laid down. After the pending bills were filed, the defendants repeated the instructions originally given, and for a while posted signs in their stores and notices on the menu cards to the effect that no Coca-Cola was sold therein.

Notwithstanding all these efforts, a few dispensers and waitresses, few in relation to the total employed, disregarded the instructions and substituted one beverage for the other. Some disobeyed the orders even after the bills were filed and the signs displayed that no Coca-Cola was sold in the store.

Now what more the defendants could have done to insure against the sort of wrong that the bills complain against, I do not for the moment see. After they learned that the complainant was investigating their stores, they arranged for some one to go into the stores and try out the employees with trap-orders for Coca-Cola. Their own investigator reported faithful compliance with the orders and instructions theretofore issued. Indeed the complainant's own investigators testified that even in the early stages of the new beverage's installment at the fountains, when the confusion incident to change was at its worst stage, when Coca-Cola was called for they met with refusals at the hands of the employees. I believe I am justified in the statement from all the facts that the refusals far outnumbered the substitutions in the early stage of the investigation before the disobedient employees had been spotted. And in view of the fact that the complainant's investigators concentrated on one hundred out of the eighteen hundred dispensers and waitresses, it is well within the bounds of reason to say that on the whole the defendants' employees faithfully obeyed the instructions given to them. This is a strong indication of the *bona fides* of the defendants in respect to their efforts to disseminate throughout the large force of their clerks and salesmen a genuine purpose to deal fairly towards the complainant when its product was called for.

In *Newcomer & Lewis v. Scriven Co.,* (*C. C. A.*) 168 *F.* 631, the court referred to the fact that one or two trap-orders failed in their purpose, and apparently regarded that as a circumstance to be taken into account as nega-

tiving a constructive intent on the part of the employer to substitute goods other than the complainant's in response to a call for the complainant's goods, which intent it was sought to infer from an act of substitution indulged in by one employee.

So here it is exceedingly difficult for me to attribute to the defendants a purpose to substitute Pepsi-Cola for Coca-Cola notwithstanding the number of instances shown of substitutions by either disobedient or negligent employees when in the cases of the vast majority of employees it is in all probability true that substitutions were or would have been refused to be made.

If an injunction had been outstanding in terms as prayed for in the pending bills and the acts of substitution shown by the evidence had taken place, and if the defendants were now before the court on charges of contempt, I should feel impelled to dismiss the charges, if the facts now shown in defense were advanced in exculpation. That being so, I conclude that the injunction should not issue in the first instance and that the bills should be dismissed.

Whether any of the dispensers and waitresses of the defendants are now continuing to disobey the express instructions given them, I do not know. Certain it is that the complainant cannot in justice be expected to continue indefinitely to be victimized by the persistent acts of any recalcitrant employees of the defendants. The dismissal of these bills will be without prejudice to the complainant's right to renew its application if the employees of the defendants persist in refusing to obey instructions laid upon them. If in subsequent litigation in this court the substitutions are shown to be continuing, whether the mere giving of instructions by the defendants, no matter how positively conveyed, should be accepted as sufficient to warrant the refusal of an injunction would depend on the circumstances. Suppose the circumstances were shown that one of the employees was continuing to practice

substitution in defiance of express orders to the contrary, then, if upon acquiring knowledge of that fact the responsible managers of the corporate employer should, instead of dismissing the offending employee, retain him in his employment, I would consider that circumstance as inclining to negative the *bona fides* which the instructions theretofore given would presumptively reveal. Indeed there has been some question in my mind whether the defendants have not prejudiced themselves by failure to show a dismissal of such of the employees as have been conclusively shown to have been for a time at least disposed to practice the trickery complained about, even though the presence of such individuals in the defendants' sales force and their identification remained undisclosed until during the taking of the testimony in these causes. Upon reflection, however, I have reached the conclusion, under all the circumstances shown, that the stigma of an injunction should not be placed upon the defendants because of their omission in that regard. In case, however, there is a renewal of this litigation and acts on the part of dispensers and waitresses similar to those now complained against are continued into the future from now, the defendants' failure to resort to some such form of drastic preventative as dismissal of the offender, should weigh heavily against the employer-defendant. I say this because now that the defendants are fully advised of the wrongful conduct that has been practiced in their stores, even though it be limited in extent, it is reasonable to expect of them that they should then supplement the orders and instructions heretofore relied upon as effective with severer methods, if the good faith which in the first instance may be ascribable to them is not to be overthrown.

As to costs, it seems to me they should be imposed on the defendants. But I am willing to receive the views of the solicitors upon that question before finally determining it.