**COCA-COLA CO. v. HY-PO CO. et al.**

District Court, E. D. New York.

Aug. 22, 1932.

James F. Hoge and Edward S. Rogers, both of New York City, and Harold Hirsch, Marion Smith, Frank Troutman, and Roy Jones, all of Atlanta, Ga., for plaintiff.

Kadel, Van Kirk & Trencher and Frank Steinberg, all of New York City (Bernard Trencher, of New York City, of counsel), for defendants Hy-Po Co. and Jack Liss.

Samuel Rabinowitz, of New York City, for defendants Hillel Sharf, Isidore Sharf, and Mixo-Cola Co.

INCH, District Judge.

Plaintiff corporation, a citizen of the state of Delaware, makes and sells a beverage which is called Coca-Cola. It has been doing so for many years and, by diluting it with carbonated water, many people have found it to be a refreshing drink.

Large sums of money have been spent by plaintiff in distributing and advertising this drink.

In this way it has become so popular that it has been said by the Supreme Court (1920): "The name now characterizes a beverage to be had at almost any soda fountain. It means a single thing coming from a single source, and well known to the community. It hardly would be too much to say that the drink characterizes the name as much as the name the drink. In other words 'Coca-Cola' probably means to most persons the plaintiff's familiar product to be had everywhere rather than a compound of particular substances." Coca-Cola Co. v. Koke Co., 254 U. S. 143–146, 41 S. Ct. 113, 114, 65 L. Ed. 189.

According to the testimony approximately $5,000,000 was spent by plaintiff in advertising this drink in 1931, the sales that year amounting to considerably over $26,000,000.

When such a product, of this continued success and nature, with the remunerative result indicated, is considered, and the general hurry and the carelessness of a citizen seeking a drink at a soda fountain is contemplated, the attraction is strong to those who would unfairly compete with plaintiff and slyly profit by its great advertising campaign continually carried on by plaintiff.

It is not surprising therefore to find repeated and various attempts of this kind of competition, some of which have justified proceedings in the courts, requiring at all times, as indicated in this record, constant vigilance on the part of plaintiff and the maintenance by it of a large and expensive staff of investigators and chemists. See, for instance, Coca-Cola v. Old Dominion Beverage Co. (C. C. A.) 271 F. 600; Coca-Cola Co. v. Duberstein (D. C.) 249 F. 763; Coca-Cola v. Chero-Cola Co., 51 App. D. C. 27, 273 F. 755; Coca-Cola Co. v. Brown & Allen (D. C.) 274 F. 481; Coca-Cola v. Gay-Ola Co. (C. C. A.) 200 F. 720; Coca-Cola v. Koke Co., 254 U. S. 143, 41 S. Ct. 113, 65 L. Ed. 189.

There is, however, another thing that has interested me, at this trial, in regard to the beverage itself, that is, that which the syrup actually contains, as a whole, is consistently maintained by plaintiff to be secret. To be sure there is a standard fixed by plaintiff in regard to its ingredients such as the definite amount of caffeine, phosphoric acid, etc., and the color, produced by caramel, being measured by plaintiff's chemists by the usual colorimeter. But, nevertheless, even the chemists of plaintiff state that there is, in addition, a so-called flavoring ingredient which is secret, and this consists of several elements which are not disclosed and which are only known to the employees of plaintiff as "7X."

For instance, taking at random the testimony, the witness Allen, one of plaintiff's chemists at Atlanta, Ga., duly qualified and so employed for several years, stated that he had been long engaged in the manufacture of Coca-Cola syrup and that this flavoring ingredient "reached me in a sealed can, shipped from Atlanta, Georgia. * * * That the name for the ingredient is called 7X. That it is the 'secret' flavor."

Not to be outdone in this regard, the defendants also have a "secret" flavor.

So that, so far as copying the exact drink of plaintiff is concerned, while the plaintiff has the right to keep its ingredients secret, this court cannot find that its drink in regard to all its elements was or has been copied.

However, this is but a part of the question submitted, nor does it leave the plaintiff remediless where unfair competition is shown in other respects.

Plaintiff claims that while defendants used the name Hy-Po and not that of Coca-Cola, yet its labels were confusing to the public and that plaintiff always sent its product to dealers in "red" barrels and that defendant used the same colored barrels. That advertising used by defendants was likewise confusing to the public and also that, in a number of instances, defendants' beverage was sold to persons requesting Coca-Cola as the plaintiff's drink.

Of course, this sort of competition was unfair and should be stopped, and it needs the citation of no authority for such action by the court as its vice is obvious and direct.

This suit was commenced on or about February 11, 1932, and, so far as I can find, no such direct act of unfair competition has been proved since the commencement of the suit.

The fact that such acts did occur, however, for a considerable time, from a period in 1931 down to about the time when the suit was commenced, was duly proved and will be noticed later.

Both the syrup of plaintiff and that of defendant is approximately white and must be colored by caramel to obtain the familiar reddish-brown color of Coca-Cola and the color of defendants' product.

Accordingly, in addition to these direct acts of unfair competition as to which there can be no question as to plaintiff's rights and which defendants protest that they no longer continue even if it could be found, which they dispute, that they ever took place with the knowledge and consent of the defendants, the plaintiff claims an exclusive right to this "color" of the drink by caramel and that, in this way, the defendants give to their product a distinct and characteristic "color" as a part of intentional unfair competition by them with plaintiff for the reason that plaintiff claims the usual and careless citizen buys the drink because of its "color" among other things. Plaintiff claims also that the defendants intentionally manufactured and placed upon the market their beverage with the

known ingredients I have already mentioned in substantially the same proportions and with this distinctive color and a similar taste for the sole purpose of not only confusing the general public with Coca-Cola, but in this way unfairly taking unfair advantage of the money so expended by plaintiff and the acknowledged popularity of its drink.

Before proceeding further a word should be said about how this suit arose.

Defendants are: The Hy-Po Company, Inc., a citizen of the state of New York. Whenever reference is made hereafter to the defendant corporation it is intended, unless otherwise stated, to refer to this defendant. Hillel Sharf also known, and sued as Harry Sharf, his brother Isidore Sharf, and Jack Liss.

In the bill of complaint there were also named as defendants a "Mixo-Cola Company" and Sharf's Luncheonette"; but it now appears that there were no such corporations, the confusion arising from the use of trade-names by individual defendants.

In the late spring of 1931 a man named Greenspan, who later became a director of and a salesman for the defendant corporation and who had some sort of an interest in several drug stores, introduced Hillel Sharf to the defendant Liss. The latter was at that time experimenting with the formula for a beverage syrup. He made it in the basement of his drug store and sold it at his fountain above.

Hillel Sharf, with his brother Isidore Sharf, was in the sign business in Long Island City.

Greenspan had become acquainted with the Sharfs by reason of the latter supplying advertising signs. Thereupon the Sharfs, Liss, and one named Berg went into the manufacture and sale of this product which was called Hy-Po in premises adjoining the Sharfs' place of business, provided by Sharf. Hillel Sharf became a creditor of Liss which claim he subsequently enforced by judgment and execution. After this the former drug store was a luncheonette at 63 Fifth avenue.

About August 19, 1931, the defendant corporation was organized, and on November 23, 1931, an agreement was entered into by the defendant Sharf, Liss, and others, among them Greenspan, and the defendant corporation under which new money was obtained for the venture. Greenspan and his wife became stockholders, the former becoming also a director. Liss was made president and Hillel Sharf vice president. In substance all

the parties in this original venture thus became interested in the defendant corporation.

Plaintiff's proof sufficiently shows direct acts of unfair competition by these defendants commencing with the 12th of August, 1931, prior to the formation of the defendant corporation and continuing thereafter until shortly before the suit was commenced.

In fairness to those now in charge of the defendant corporation, or at least some of them, it is likewise apparent that the ideas of Harry Sharf, who had been elected vice president of the defendant corporation pursuant to the contract of November 23, 1931, were not acceptable, for, within a month after his election, efforts were made by the defendant corporation to oust him. This took the form of an action for that purpose. Sharf made a motion to dismiss the complaint in that action, this, apparently, was denied, and, as Sharf subsequently resigned and his resignation accepted, the suit was discontinued.

It would also appear that Harry Sharf and Isidore Sharf, his brother, while this controversy was going on, became involved in still another controversy with the defendant corporation. This was because the defendant corporation claimed that the Sharfs were making the same drink as Hy-Po, only calling it Hy-Bo.

On or about December 19, 1931, therefore, the defendant corporation brought suit in the state court to restrain the Sharfs from making and selling this drink known as Hy-Bo. This suit is still undetermined. A temporary injunction was granted to the defendant corporation which, on appeal, was affirmed. 255 N. Y. S. 876.

Thus, while it appears that those in charge of the defendant corporation, after its formation, were having these misunderstandings, the proof shown by the plaintiff on this trial indicates that during these personal controversies and the last-mentioned suit the real issue was to prevent the sale of the drink Hy-Bo rather than any desire not to unfairly compete with plaintiff.

The situation now therefore is, giving the benefit of all fair inferences to the defendant corporation, which should not be assumed as intending to unfairly compete, that the original intention, certainly of the Sharfs, and probably of all of the defendants, was to unfairly compete with the plaintiff in the direct and unlawful manner already mentioned, and that, shortly before the commencement of this suit by plaintiff, and at the present time, the defendant corporation decided to and is endeavoring to manufacture and sell its product on the merits of its beverage alone.

No direct act of unfair competition was proved by plaintiff at the time or subsequent to the commencement of this suit.

The defendant corporation prior to the commencement of the suit discontinued the use by it of red barrels, one of the distinctive marks of plaintiff's containers, and on December 28, 1931, the defendant corporation ordered natural wood white barrels, receiving the first shipment of them on or about January 11, 1932, about a month previous to the commencement of the suit. No red barrels were used after that date, and the defendant's syrup was taken out of such red barrels as then contained it and put into these new white barrels.

It is also shown that the defendant corporation's beverage does in fact contain extractives from "coca" leaves and "koke" nuts, but even in this regard the defendant corporation has now discontinued the use of such former labels as were plainly confusing.

The testimony likewise shows that advertising of the defendant corporation has been changed and that it has expended in such advertising since its incorporation up to June 1, 1932, about $27,000; the amount of product that has been sold by the corporation from its organization to June 1, 1932, being 9,643 gallons at $1.50 a gallon.

The price of a gallon of Coca-Cola apparently is $2.10.

Defendant corporation employs about ten or twelve salesmen.

We may now pass to the remaining question, that in regard to the "color" adopted by defendants, and particularly as to the intention of the defendant corporation in that regard.

■ "The doctrine of unfair competition cannot be successfully invoked to abridge the freedom of trade competition." Kawneer Co. v. McHugh (D. C.) 51 F.(2d) 560, 564; Viavi Co. v. Vimedia Co. (C. C. A.) 245 F. 289.

"The essence of the wrong in unfair competition consists in the sale of the goods of one manufacturer or vendor for those of another; and if defendant so conducts its business as not to palm off its goods as those of complainant, the action fails." Howe Scale Co. v. Wyckoff, etc., 198 U. S. 118–140, 25 S. Ct. 609, 614, 49 L. Ed. 972.

Plaintiff would seem to argue that it has an authority in this regard which would give

it the exclusive right not to have the color of its beverage copied. Coca-Cola Co. v. Gay-Ola Co., 200 F. 720 (C. C. A. Sixth, 1912). A reading of the opinion of this distinguished court, however, does not seem to go to the extent that would be claimed for it by plaintiff. It was there found that the defendants adopted the color "for the main and primary purposes of making the two articles look just alike." In other words, this would seem to me to be simply the finding that it was there an intentional act of unfair competition, which, combined with other proof, should be and was properly considered. Making a thing look like another with the intention to unfairly compete is very properly an act of unfair competition. It seems to me that this distinction is not only correct, but is far better expressed by Mr. Justice Holmes in the later case Coca-Cola Co. v. Koke Co., 254 U. S. 143, at page 147, 41 S. Ct. 113, 114, 65 L. Ed. 189 (1920), where he says: "The product including the coloring matter is free to all who can make it if no extrinsic deceiving element is present."

■ The plaintiff should not, on these facts, be given the exclusive right to manufacture a "brown" syrup.

The use of caramel as a color by this defendant corporation is now purely functional. There is testimony as to about fifty beverages of a similar color from Root Beer to Ginger Ale. The use of caramel as such a color has been widely known and used for years long before plaintiff's product came into the market.

Accordingly, I find that the use of this general color alone is not sufficient basis for injunction, nor can that right arise from extensive and expensive advertising. If, however, an intent is otherwise shown, to unfairly compete, the copying of a color is a proper element to be considered. It is an overt act so to speak, making, or tending to make, consummation of the intention a fact.

The case was carefully and skillfully tried not only by the counsel for plaintiff, but by the counsel for the defendant corporation, and it was shown that in its present advertising it was endeavoring to avoid confusion in the public's mind. To be sure this could not be done by fixing up the old form of advertising, but money and time have been expended in entirely new and proper advertising, the use of such things as the red barrels has been discarded, and white barrels are used. In other words, whatever may have been the original intention of this venture in the beverage market, I find that the defendant cor-

poration is now endeavoring to place its drink Hy-Po on the market in competition with plaintiff but without an effort, direct or indirect, to confuse the public or to sell its product as Coca-Cola.

Those who have now come into the control of the defendant corporation assert that they are competing and intend to compete solely on the respective merits of the beverage.

This then is the situation. The defendants before the organization of the defendant corporation, and thereafter for a period up to shortly before the commencement of this suit, certainly had the idea of unfairly competing with plaintiff. Perhaps this originated with those that thereafter ceased to be officers of the corporation, but certainly it was in the minds of the others, as well, originally and perhaps until new money and proper advice was given and followed.

The plaintiff therefore was justified in appealing to this court for protection and has done so in a long and expensive trial.

■ To be sure the plaintiff's position must be judged by the facts as they were when the suit was begun, and not by the facts of the different conditions and at an earlier time. Coca-Cola v. Koke Co., 254 U. S. 147, 41 S. Ct. 113, 65 L. Ed. 189. But it is likewise the duty of the court to protect this plaintiff from unfair competition if such continued protection is indicated as necessary from the facts proved. To what extent this further protection is necessary is for the court to decide.

There was plainly unfair competition intended and practiced prior to this suit, and if certain defendants again obtain control of the defendant corporation or circumstances change, the plaintiff will be put to another expensive and unnecessary litigation in order to protect its product. This the court cannot foresee in favor of defendants.

Under such circumstances it seems to me that the duty of this court is to protect the plaintiff from such a situation, so far as it can do so, without unreasonable injury to the lawful and proper business of the defendant corporation. The acts of the defendants alone have been responsible for the litigation. Oxford University v. Wilmore-Andrews Pub. Co. (C. C.) 101 F. 443, 444; Burnett v. Hahn (C. C.) 88 F. 694.

As has been said: "The right of a defendant to avoid an injunction because he has ceased to infringe is always conditional upon his showing affirmatively that he has wholly abandoned the business. Even then courts have often thought that as the writ cannot

harm him, and as it may protect the plaintiff, it should issue." Wesson v. Galef (D. C.) 286 F. 621–626.

And finally: "No assurance is in sight that petitioner, if it could shake respondent's hand from its shoulder, would not continue its former course." Guarantee Veterinary Co. v. Federal Trade Commission (C. C. A.) 285 F. 853–860. See, also, Ricker & Son v. Leigh, 74 App. Div. 138–140, 77 N. Y. S. 540; Nims on Unfair Competition (3d Ed.) p. 946, § 372, and cases cited.

While therefore the defendant corporation has the right to color its product as it pleases provided there is no extrinsic deceiving element and to manufacture and sell its product in fair competition, I am not, in view of the evident facts presented, and the very reasonable cause of this litigation, persuaded that plaintiff is not entitled, for its own protection, to a decree which will protect it against any possible recurrence of the acts complained of. At the same time this will not prevent the defendant corporation from carrying on a legitimate business if it so desires.

For this situation the defendants alone have themselves to blame and the result is no more than they have apparently decided to do themselves.

Accordingly, plaintiff is entitled to a decree, with costs, restraining the defendants, etc., from using in the connection with the manufacturing, offering for sale, etc., of any product, not being the genuine product of the plaintiff, on labels, in advertisements, or orally, the words Coca-Cola, Mixo-Cola, or any colorable imitation of plaintiff's trademark Coca-Cola. And from suggesting defendants' product be substituted or passed off for or mixed with Coca-Cola, or from passing off or assisting others to pass off defendants' product as and for Coca-Cola, from using in the sale or shipment of any product not the plaintiff's, barrels or receptacles colored red, from selling or disposing of any beverage or syrup of the same or substantially similar color to Coca-Cola except when such beverage or syrup is sold in bottles, receptacles, or packages marked or labeled prominently with the name of defendants' product and designed or intended to be delivered to or plainly displayed to the ultimate consumer in said original bottle, receptacle, or package, the said mark or label still remaining thereon, from doing any act or using any name or names, devices, artifices, or contrivances which may be calculated to represent, or enable defendants' customers to represent, that any product, not being the genuine and unadulterated product of plaintiff, is Coca-Cola.

Submit findings. Settle decree on notice.