THE COCA-COLA COMPANY, a corporation of the state of Delaware, Complainant,

*vs.*

NEHI CORPORATION, a corporation of the State of Delaware,

*New Castle, March 20, 1942.*

*Hugh M. Morris, E. S. Rogers,* of New York City, *Marion Smith,* of Atlanta, Ga., *Hilary. W. Gans,* of Baltimore, Md., *James H. Rogers,* of Chicago, Ill., and *Joseph M. Collins,* of Atlanta, Ga., for complainant.

*Robert H. Richards* and *Caleb S. Layton,* of the firm of Richards, Layton & Finger, *Theodore Kiendl,* of Davis, Polk, Wardwell, Gardiner & Reed, and *Ellis W. Leavenworth,* both of New York City, *C. L. Parker,* of Washington, D. C., and *W. Willis Battle,* of Columbus, Ga., for defendant.

*Clarence A. Southerland,* of the firm of Southerland, Berl, Potter & Leahy, *Arthur T. Vanderbilt,* of Newark, N. J., and *Herman Shulman,* of Hays, Podell & Shulman, of New York City, representing the Pepsi-Cola Company, *Milton Handler* and *Benjamin Algase,* both of New York City, of counsel, were also permitted to appear and file a brief as *amicus curiae.*

THE CHANCELLOR: This case is before the court on a bill filed by The Coca-Cola Company to enjoin alleged trade-name and trade-mark infringement by the Nehi Corporation, the defendant. Other related acts of unfair business competition alleged to have been committed by the defendant company are also sought to be enjoined.

Dr. John S. Pemberton, of Atlanta, Georgia, first manufactured and sold Coca-Cola, under that trade-name, written in script letters, under which appeared a paraph or flourish, as early as 1886; and since that time it has been manufactured and sold under the same trade-name by his individual and corporate successors. That name was registered as a trade-mark, in the United States Patent Office, under the various Trade-Mark Acts, in 1893, 1905, 1927 and 1928, and is still registered in that office.

Coca-Cola is perhaps the most popular soft drink on the market, and has had phenomenal sales in this and other countries for many years. Ordinarily, it is sold to the public through licensed bottlers, in plain six ounce bottles, and has a dark brown color which is caused by the use of some mixture of caramel. The bottles in which it is sold have a metal cap, on which the usual trade-name or trade-mark "Coca-Cola" appears in white letters on a red background.

Nehi Corporation, the defendant, likewise succeeded an earlier corporation of the State of Georgia about December 1st, 1938. Its real registered trade-name in the United States Patent Office is "Royal Crown." That corporation and its predecessors have manufactured and sold Royal Crown Cola, in ever increasing quantities, since the latter part of December 1934; Nehi Cola since a much earlier date, and Par-T-Pak Cola since 1935 or 1936. All of the defendant's drinks are unpatented, carbonated beverages or soft drinks resembling Coca-Cola in both color and taste. The similarity in the color is likewise caused by the use of a caramel mixture.

Royal Crown Cola, or Royal Crown RC Cola as it is sometimes called, is sold by the defendant, or by its licensed bottlers, in twelve ounce, clear glass bottles, which differ in size, shape and appearance from the distinctive six ounce bottle used by The Coca-Cola Company. It is occasionally advertised as "RC Cola," but that designation alone is never used on either the labels on the bottles or on the caps. Nehi Cola and Par-T-Pak Cola may have been sold at times in bottles of a different size and type; but that all of these beverages are Nehi products is indicated by words and letters appearing in the glass of each bottle, or on the labels. The words "Royal Crown" appear at the top of the label on each bottle of that drink. The name "Cola" appears at the bottom, and above that word are the letters "RC" appearing on a truncated pyramid. The wording and its arrangement on the bottle cap is similar to that appearing on the label, except in some instances the letters "RC" are omitted from the cap. The product of each company is sold at five cents a bottle. Both the complainant and the Nehi Corporation are spending large sums of money annually advertising their drinks by the use of roadside and other large and small signs, by radio broadcast campaigns, in newspapers, magazines, and otherwise. That general advertising policy had been followed by The Coca-Cola Com-

pany for many years prior to the advent of Royal Crown Cola, at a cost of millions of dollars, and has resulted in the building up of a tremendous business good-will in its enterprise. The defendant company did not advertise Royal Crown Cola, to any great extent, until about 1937; but since that time it has likewise spent large sums of money for that purpose, and has built up a considerable business in the sale of that drink. Its other products are being sold in much smaller quantities.

The basic question is whether Royal Crown Cola, Royal Crown RC Cola, RC Cola, Nehi Cola and Par-T-Pak Cola, the various names under which the defendant's beverages are being advertised and sold, are deceptively similar to the complainant's trade-name and trade-mark "Cola-Cola". That largely depends on the right of the defendant corporation to use the word "cola" in a denominative sense in selling its drinks. Its right to use that word in a descriptive sense is conceded. The use of a similar color to Coca-Cola, together with the word "Cola", is, however, said to be an accompanying instrumentality of deception, of peculiar importance, and is likewise sought to be enjoined. The complainant company also seeks to enjoin the continuance of other related acts of alleged fraudulent and unfair business competition, such as suggestions by defendant's sales agents that Royal Crown Cola, when sold by the glass, can be profitably passed off for Cola-Cola. Various modes of advertisements are also complained of as being deceptive. But perhaps the most of these acts are mainly relied on as corroborative evidence compelling the inference that the use of the word "cola" by the Nehi Corporation is for the real purpose of deceiving the public, and to permit it to profit by complainant's well established business good-will in the trade-name "Coca-Cola". Ordinarily, the proper function of a trade-name or trade-mark, adopted by a manufacturer or merchant, is to identify the real origin and source of the goods to which it is affixed. *Hanover Star Milling Co. v.*

*Metcalf*, 240 *U. S.* 403, 36 *S. Ct.* 357, 60 *L. Ed.* 713. The chief advantage of its use lies in its possible power to stimulate sales. The infringement of a trade-name consists in its unauthorized use, or in the unauthorized use of a colorable imitation, by another producer on goods of substantially the same character as those for which the name or mark has already been legitimately appropriated by the complainant. *Hanover Star Milling Co. v. Metcalf, supra; Thaddeus Davids Co. v. Davids*, 233 *U. S.* 461, 34 *S. Ct.* 648, 58 *L. Ed.* 1046. In all such cases confusion of origin, and not confusion of goods, is the question involved. *Vick Chemical Co. v. Vick Medicine Co.*, (D. C.) 8 *F. 2d* 49, *affirmed*, (5 Cir.) 11 *F. 2d* 33; *Anheuser-Busch v. Budweiser Malt Products Corp.*, (2 Cir.) 295 *F.* 306. The basic governing principle is that one manufacturer, by the use of a confusingly similar trade-name, cannot unfairly sell his goods for those of another. *Yale Electric Corp. v. Robertson*, (2 Cir.) 26 *F. 2d* 972; *Pepsi-Cola Co. v. Coca-Cola Co.*, 1940, 1 *Dom. L. R.* 161. In unfair competition cases, perhaps, this is ordinarily "the whole Law and the Prophets on the subject, though it assumes many guises." *Yale Electric Corp. v. Robertson, supra* [26 *F. 2d* 973]. Most infringement cases involve alleged colorable imitations; a precise copy would hardly be attempted. Infringement may exist in some cases if a substantial part of a trade-name or trade-mark of another is used on a product of the same nature, though there are some differences in the whole names used. *Enoch Morgan's Sons Co. v. Ward*, (7 Cir.) 152 *F.* 690, 12 *L. R. A.*, *(N. S.)* 729; *Standard Oil Co. v. Independent Oil Men of America*, 58 *App. D. C.* 372, 30 *F. 2d* 996; *Saxlehner v. Eisner & Mendelson Co.*, 179 *U. S.* 19, 21 *S. Ct.* 7, 45 *L. Ed.* 60. But that does not necessarily follow *(Caron Corporation v. Conde, Limited*, 126 *Misc.* 676, 213 *N. Y. S.* 735, *affirmed* 220 *App. Div.* 835, 222 *N. Y. S.* 781; *Dixi-Cola Laboratories, Inc., et al., v. Coca-Cola Co.*, (4 Cir.) 117 *F. 2d* 352; *Amer-*

*ican Brake Shoe & Foundry Co. v. Alltex Products Corp.,* (2 *Cir.*) 117 *F.* 2d 983) ; it depends on the facts.

In *Caron Corporation v. Conde, Limited, supra* [126 *Misc.* 676, 213 *N. Y. S.* 736], the court aptly said:

"A phrase or a combination of words may be entitled to absolute protection, while the use of its component parts separately may be open to every one".

But to constitute trade-name infringement, it is not necessary that the similarity in the name complained of be such as to deceive only the cautious purchaser. *Pepsi-Cola Co. v. Coca-Cola Co., supra; Allen v. Walker & Gibson, (D. C.)* 235 *F.* 230. It is usually sufficient if the similarity is such that it is likely to deceive the ordinary purchaser. *Allen v. Walker & Gibson, supra.*

Trade-name or trade-mark infringement is a narrower term than unfair competition, but it is a species of it. *Hanover Star Milling Co. v. Metcalf, supra.* Any unfair conduct, the natural and probable result of which is to permit the goods of one person, of the same kind, to be passed off for those of another, is usually unfair competition in some form, and in a proper case will be enjoined. *Warner & Co. v. Eli Lilly Co.,* 265 *U. S.* 526, 44 *S. Ct.* 615, 68 *L. Ed.* 1161; *Yale Electric Corp. v. Robertson, supra.* Whether trade-name or trade-mark infringement, or some other variety of unfair competition, exists in a particular case is always a question of fact, depending on the circumstances.

Ordinarily, in determining that question the following factors must be considered:

"(a) the degree of similarity between the designation and the trade-mark or trade name in

"(i) appearance;

"(ii) pronunciation of the words used;

"(iii) verbal translation of the pictures or designs involved;

"(iv) suggestion;

"(b) the intent of the actor in adopting the designation;

"(c) the relation in use and manner of marketing between the

goods or services marketed by the actor and those marketed by the other;

"(d) the degree of care likely to be exercised by purchasers."

§ 729 *Restat. Law of Torts.*

In the same section the following pertinent comment on paragraph (a) appears:

"Similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features".

See also *Pepsi-Cola Co. v. Coca-Cola Co.,* 1940, 1 *Dom. L. R.* 161.

Moreover, when other distinguishing features clearly appear, a trader is not ordinarily guilty of infringement if he uses a descriptive or generic word as a part of his trade-name, even though the same word has already been used by a competitor. *Dixi-Cola Laboratories, Inc., v. Coca-Cola Co., supra; Delaware & Hudson Canal Co. v. Clark,* 13 *Wall.* 311, 20 *L. Ed.* 581; *S. R. Feil Co. v. John E. Robbins Co.,* (7 *Cir.*) 220 *F.* 650; *American Brakeshoe & Foundry Co. v. Alltex Products Co., supra; Standard Paint Co. v. Trinidad Asphalt Co.,* 220 *U. S.* 446, 31 *S. Ct.* 456, 55 *L. Ed.* 536.

In considering this question, the court in *Delaware & Hudson Canal Co. v. Clark, supra* [13 Wall. 311, 323, 20 L. Ed. 581], aptly said:

"Nor can a generic name, or a name merely descriptive of an article of trade, of its qualities, ingredients, or characteristics, be employed as a trade-mark and the exclusive use of it be entitled to legal protection".

This is because such a name or word is in the public domain, and with proper distinguishing features can be used by any one without being guilty of fraud or deception. *Delaware & Hudson Canal Co. v. Clark, supra; Standard Paint Co. v. Trinidad Asphalt Co., supra; Nims on Unfair Competition & Trade-marks,* 110.

The word "cola" is one-half of the complainant's trade-name. That company, therefore, claims that its use by the Nehi Corporation in its trade-names makes them deceptive-

ly similar to Coca-Cola. As heretofore stated, that is the real basic question to be determined.

In *Pepsi-Cola Company v. Coca-Cola Company*, 1940, supra, the court said:

"No doubt each of the words (Coca-Cola) is a descriptive word, but we are not prepared to say that a trader cannot join the words into a compound, which written in a peculiar script constitutes a proper trade-mark."

The Nehi Corporation concedes this; but nothing more. It claims that the word "cola", as used by the complainant, has always had a certain descriptive significance, and cannot be exclusively appropriated by any one; to do so would constitute a monopoly. *Delaware & Hudson Canal Co. v. Clark, supra.*

It also claims that the word "cola" has now become generic of a well-known type of drink.

In *United States v. Coca-Cola Company (United States v. Forty Barrels and Twenty Kegs of Coca Cola)*, 1916, 241 *U. S.* 265, 36 *S. Ct.* 573, 581, 60 *L. Ed.* 995, *Ann. Cas.* 1917 *C.* 487, the court said:

"In the present case * * * it could not be said as matter of law that the name [Coca-Cola] was not primarily descriptive of a compound with coca and cola ingredients, as charged * * *; the claimant has always insisted, and now insists, that its product contains both."

In *Coca-Cola Company v. Koke Company of America*, 254 *U. S.* 143, 41 *S. Ct.* 113, 114, 65 *L. Ed.* 189, the court said:

" 'Coca-Cola' probably means to most persons the plaintiff's familiar product to be had everywhere rather than a compound of particular substances."

But that is not the real question to be determined. Moreover, that statement was necessarily based on the facts before the court.

In *Coca-Cola Company, v. Koke Company*, the real question was whether the word "koke" was used by the public as a name for Coca-Cola. Secondary meaning was also

relied on by the complainant to sustain the validity of its mark.

But, under the pleadings that company concedes that no such question is involved here. Furthermore, there is no direct evidence that "Coca-Cola" was ever known as "Cola". The court emphasizes that point in *Dixi-Cola Laboratories, Inc., v. Coca-Cola Company*, (4 *Cir.*) 117 *F.* 2d 352.

A brief history of the cola nut, when considered with various other evidential facts, including declarations and even admissions by officers and agents of the Georgia predecessor of the complainant company, seem to justify the defendant's contention that the word "cola" in the complainant's trade-mark has always had some descriptive significance. Cola nuts are the seeds of a fruit which grows on trees native to tropical West Africa, but which may have been transplanted to some other tropical countries. They have a dark brown color, and are about the size of an ordinary horse chestnut; but the extract made from them seems to be almost colorless. They are said to contain a large amount of caffeine, and their tonic and stimulant properties seem to have been known to the African natives for centuries. Literature indicates that cola nuts have been used by them in various ways, for countless generations; among others, in the making of a drink mixed with milk and honey. When roasted, cola nuts have been sometimes called "Soudan Coffee", and long prior to 1886 published articles had predicted that they might ultimately be used in making a substitute for tea and coffee. The word "cola" appeared in English dictionaries and encyclopedias as early as 1856, and in the United States as early as 1875; and the fair inference is that in subsequent years it became increasingly better known. The properties of the cola nut were discussed at some length in a French article published about 1832. After certain experiments were made in England in 1865 and the results were published, other experiments and published articles referring thereto multiplied. Many of these articles

were published both in England and America before 1886. For some years prior to that time, discussions of that character appeared in American Pharmaceutical and other scientific journals almost yearly. Moreover, cola-containing beverages and tonics were known both in England and America before 1886, and some of them were, in part, designated by the word "cola". African decoctions of cola nuts were mentioned in various published articles and encyclopedias between 1865 and 1881. A British patent was procured in the latter year for the manufacture of "beer or other beverages * * *"; the "Kola Nut" extract was an ingredient. It was also expressly stated that "carbonic acid gas may * * * be introduced * * *." The same patent referred to compounds which could be "used in a similar manner to tea and coffee for making wholesome, non-intoxicating liquors or beverages." American druggists' publications referring to this patent, appeared in this country in 1883 and 1885. In the latter year, the same and other publications also discussed the development by Thomas Christy, of London, of a beverage known as "Cola Chocolate." Other and frequent references to the use of the cola nut for beverage purposes appeared in various publications in 1882 and 1884. Furthermore, prior to 1886, references to published discussions relating to its properties and use, and showing that "cola" was a known word, could be multiplied. The catalogue of Frederick Stearns & Co., in 1883 and 1884, associated the words "coca" and "cola", and discussed their properties in parallel columns. These words were likewise associated in other publications prior to 1886. The Nehi Corporation claims that the evidence shows that in 1884 or 1885, one Benjamin Kent, a druggist of Paterson, New Jersey, dispensed a "tonic preparation" or "bracer" which he called "Kent's Coca-Cola"; but it is doubtful whether that alleged fact has been satisfactorily proven. Apparently there was testimony to that effect before the United States' Patent Office in 1916 in a proceeding brought by the Coca-

Cola Company opposing the registration of the name "Chero-Cola." That record was put in evidence by the Coca-Cola Company, but it could only have been intended to show what issue was before the patent office. It cannot be regarded as an admission by the Coca-Cola Company. But that is merely one of many facts relied on by the defendant company to show that the word "cola" in the complainant's trade-name had some descriptive significance in 1886. Its exclusion will not affect the result. Whether the cola nut was then well known to all classes of persons, or whether knowledge of it was confined to a relatively small class, perhaps including scientists and some druggists, is unimportant. *Dixi-Cola Laboratories, Inc., et al., v. Coca-Cola Co., supra; United States v. Coca-Cola Co. (United States v. Forty Barrels and Twenty Kegs of Coca Cola)*, 241 *U. S.* 265, 36 *S. Ct.* 573, 60 *L. Ed.* 995, *Ann. Cas.* 1917 *C.* 487. Many words in the English language are unknown to a considerable portion of the public. But it is apparent that Dr. Pemberton and others who had an early connection with the manufacture and sale of coca-cola had some actual knowledge of the cola nut and of its properties as early as 1887. Dr. Pemberton, on his original Coca-Cola label used in that year, advised the public that it "contains the valuable tonic and nerve stimulant property of * * * Cola (Kola) nuts." In 1891, Asa G. Candler, then apparently the sole owner of the Coca-Cola formula and of the trade-name, and later president of the original Georgia corporation, used a letter-head which referred to Coca-Cola as "The New and Popular Fountain Drink containing the tonic properties of * * * the famous Cola Nut." It seems that Coca-Cola was also advertised by that company at an early date as "containing the wonderful properties of * * * the cola nut." But that is not all; in 1892, the secretary of the Coca-Cola Company testified in a patent office case that "the syrup was given this name on account of the extract which it contained—Coca and Cola—made from the coca leaves and cola nut." That

officer claimed that he named the beverage; and the Coca-Cola Company admits the truth of that claim in its booklet issued in 1901. In that year, the bill of complaint of the *Coca-Cola Company v. John B. Daniels,* filed in Fulton County, Georgia, and signed by the president of that company, under oath, alleged "The name (Coca-Cola), in large measure, being descriptive of the character of the article." In that proceeding, the complainant company sought to restrain the defendant's use of "Daniel's Passiflora Koka Kola." In *Coca-Cola Company v. Henry A. Rucker, Collector of Internal Revenue,*[1] Mr. Candler testified "We take what we know as coca leaves and cola nuts. Those are the two leading ingredients. We call it 'Coca-Cola'. The United States Government won't give us copyright unless we put 'Coca' and 'Cola' in it." In response to the question—"Well now, what has Coca-Cola got in it?", the same witness replied "Cola nuts; the leading ingredients cola nuts; we use it for its caffeine effects".

The first Coca-Cola trade-mark registration under the Act of February 20th, 1905, was under the ten year provision of *Section* 5, 15 *U. S. C. A.* § 85, which permitted the registration of a "descriptive" mark by one who has made actual and exclusive use thereof for ten years next preceding the approval of the Act. The complainant's booklet of 1901, entitled "What Is It?—Coca-Cola—What It Is", discussed the qualities of the cola nut and its presence in Coca-Cola. It also pointed out that Coca-Cola had the "stimulating and enlivening, reviving properties of the extract from the celebrated African cola nut." It describes the tree and the "brownish-yellow fruit" grown thereon in some detail. It stated that "Kola Nuts" were brought into the United States just before Coca-Cola was originated" and at that time the product of the Kola nuts, as it was "used in the manufacture of Coca-Cola cost $20.00 per pound." In 1923, in *Coca-Cola Company v. Koke Company, supra,* the solicitors for the complainant, in their reply brief, admit that both Coca and

Cola "were in bulk much the greater part of the ingredients added to the simple syrup and so helped to indicate the name." The formula used by the Coca-Cola Company is not in the record. The precise amount of the extract of the cola nut contained in that drink, and to what extent other caffeine substitutes are used, do not appear. The complainant concedes that the proportion is small; but that seems unimportant. So far as this phase of the case is concerned, the real question is whether the word "cola" used by the complainant company in its trade-name, is wholly an artificial word, or whether it has some descriptive significance. The evidence seems to justify the latter conclusion. Judicial decisions based on questions of fact, are not necessarily controlling, but there are both reported and unreported cases discussing the question that reach the same conclusion. *Dixi-Cola Laboratories, Inc., v. Coca-Cola Co., supra; Coca-Cola Co. v. Williamsburg Stopper Co.,* 1912, 2 *T. M. R.* 234; *Moxie Co. v. Noxie Kola Co., (D. C.)* 1939, 29 *F. Supp.* 167; *Fowle, et al., v. Miner's Fruit Nectar Co.,*[1] *C. C. U. S. Mass.* 1909; *Coca-Cola Co. v. Queen's City Bottling Co.* (an unreported Patent Office proceeding in 1923).[1]

In *Coca-Cola Company v. Williamsburg Stopper Company, supra,* the question was whether the trade-name "Espo-Cola" was confusingly similar to Coca-Cola. The court said "Cola is admittedly a descriptive word in which complainant is entitled to no special or exclusive rights."

In *Moxie Co. v. Noxie Kola Co., supra* [29 *F. Supp.* 170, the court said: "'Kola' is a purely descriptive term. It signifies the Cola nut or an extract of it."

In *Fowle, et al., v. Miner's Fruit Nectar Company, supra,* in which it was contended that the trade-name "Citro-Cola" infringed the trade-name "Coca-Cola", the court said:

"There is evidence from both complainants and respondents to the effect that the term 'cola' had been commonly used in a two-word descriptive name for beverages to indicate the presence of cola nuts as an ingredient."

1. No opinion for publication.

In *Coca-Cola Company v. Queen's City. Bottling Company, supra,* the United States' Patent Office examiner held that the name "Uneeda Cola" was not confusingly similar to Coca-Cola, and permitted its registration. He pointed out that "the word 'cola' is (was) clearly descriptive." The logic of these cases is persuasive.

Moreover, the evidence also justifies the conclusion that the word "cola" has now become the generic term for a well-known type of soft drinks which have a characteristic taste and color somewhat resembling Coca-Cola, and of which that company is but one of many manufacturers. Many witnesses produced by the Nehi Corporation so testified. Witnesses produced by the Coca-Cola Company, on the other hand, denied that there was any such well-known type of beverages. The defendant's witnesses were, perhaps, for the most part, officers of that company and its licensed bottlers, but other evidence seems to corroborate their statements. Hundreds of such so-called cola drinks have been on the American market, at various times, for many years. This suit was brought in September of 1939, and about that time 250 of them were sold under trade-names containing the word "cola" or "kola". With a few exceptions, all of these drinks had a brownish color, resembling coca-cola. A witness testified that in August and September of 1939 he had purchased in Georgia and Florida alone no less than 27 beverages in which the word "cola" or "kola" appeared in the trade-names used. A few of such names were registered in the United States' Patent Office under *Section* 5 of the *Congressional Act* of February 20th, 1905, which permitted the registration of a descriptive mark by one who had actual and exclusive use thereof for ten years next preceding the approval of that Act. Many more were registered as purely descriptive marks under the *Trade-Mark Act* of March 19th, 1920, 15 *U. S. C. A.* § 121 *et seq.* Prior repeated acts, and even admissions, by the Coca-Cola Company are wholly inconsistent with its present position

that it alone can use the word "cola". That was pointed out by the court in *Dixi-Cola Laboratories, Inc., et al., v. Coca-Cola Company, supra,* which apparently involved strikingly similar facts. In the proceedings in which the complainant company opposed the registration of the name Chero-Cola in 1916, the vice-president of the Coca-Cola Company, when asked how many cola beverages there were then on the market in the United States, testified—"I doubt I can tell within a thousand. There is a new one born every minute."

The trade-names of drinks containing the word "cola" have been repeatedly, and almost continuously, advertised for many years in newspapers and other publications in the United States. The existence of the type of drinks known as "cola drinks" has been recognized in various United States Government publications. Dictionaries define the word "cola" as being a type or class of beverages.

Pepsi-Cola was first sold as early as 1896; was registered in the United States Patent Office in 1903, and is still being advertised and sold in considerable quantities. Lime Cola was registered in the United States Patent Office in 1916; was advertised in various publications as early as 1917, and is still being sold. The complainant company apparently sought to enjoin its sale under that name in an infringement suit, but that litigation was abandoned in 1925. Roxa-Kola came on the market as early as 1909. In 1929, the complainant company sought to enjoin its sale under that name, but the suit was dismissed after trial. Citro-Cola was first manufactured in 1895, and a suit by one of the complainant's licensees in 1909, seeking to enjoin the use of that name, was unsuccessful. Nehi Cola has been advertised and sold under that name since 1926.

The complainant company points out that only nine beverages, containing the word "cola" in their trade-names, were advertised for ten years prior to the advent of Royal

Crown Cola in 1934; but that is not conclusive of the question.

In the reply brief filed by the solicitors for the Coca-Cola Company in 1923 in *Coca-Cola Company v. Koke Company, supra,* it was expressly and repeatedly admitted that there was a large and well-defined class of soft drinks on the market, known to the public and the trade as "cola drinks". They admitted that there were then some 75 or 80 beverages of that type being sold. It seems unnecessary to quote at length from this brief, but it contains repeated admissions of facts pertinent to this question. It may be proper to point out, however, that it stated, among other things, that

"They (cola drinks) were not classified as soda water or root beer, or lime juice, or sarsaparilla, but as cola drinks. They had a taste and flavor of their own as tea and coffee and wines and liquors have, each its own taste and flavor, and among these there might be differences in the same class. And Coca-Cola was the prototype of its class."

The testimony of Mr. Hirsch, a director of the Coca-Cola Company, in the proceedings in which the registration of the name "Chero-Cola" in the United States Patent Office was opposed, is also in sharp contrast with the present position of the complainant company. In response to a question relating to the policy of the company toward the registration of other marks containing the word "cola", he said:

"If we did (oppose registration) then we thought that those names that did·have cola in them infringed Coca-Cola. If we did not oppose them, we did not think they infringed Coca-Cola, taking the name as a whole."

Conceding that opposition proceedings in registration cases were not provided for under all of the Federal Trade-Mark Acts, the repeated and continued use of the word "cola" in registered marks, when considered in connection with other facts, has some evidential value, when public deception is the question involved. When opposed, registrations of numerous names.containing that word were refused

from time to time; but many of them were default cases. Moreover, in all such cases the burden is on the applicant to show that there is no deceptive similarity to marks previously registered. It is also significant that court decrees have been entered with the express or implied consent of the Coca-Cola Company, or its predecessors, permitting the use of the word "cola" as a part of the trade-names of various competing soft drinks. That was true in the *Espo-Cola case* in 1912 (2 *T. M. R.* 234) ; in the *Keen's Cola case,* in Ware County, Georgia, in 1913; in the *Gay-Ola case* in 1914 (*Coca-Cola Co. v. Gay-Ola Co.,* (6 *Cir.*) 211 *F.* 942) ; and in the *Lime Cola case* in 1927.

In *Coca-Cola Co. v. Keen, supra,* the decree entered provided:

"It is understood, however, and agreed that the defendant may use the name 'Keen's Cola', written in a different form of script from that so long used by the plaintiff in writing the name 'Coca-Cola'."

In *Coca-Cola Company v. Gay-Ola Company, supra* [211 *F.* 945], the complainant company consented to the use of the descriptive words "The Improved Cola".

Furthermore, on October 30th, 1923, a contract was entered into between The Coca-Cola Company and the Chero-Cola Company, a predecessor of the defendant, which prohibited that company from using the word "cola" in its trade-name, Chero-Cola. It was expressly agreed, however, that the Chero-Cola Company could describe its product as "a cola beverage", "a perfect cola beverage", or by some other like descriptive term, not a part of its trade-name. This contract did not prohibit the use of the word "cola" in any trade-name not confusingly similar to Coca-Cola. The generic character of the word "cola", as applied to soft drinks, has been recognized by the courts in numerous cases. *Dixi-Cola Laboratories, Inc., v. Coca-Cola Co., supra; Pepsi-Cola Co. v. Coca-Cola Co.,* 1940, 1 *Dom. L. R.* 161; *Coca-Cola Co. v. Carlisle Botting Works,* (*D. C.*) 43 *F.* 2d 101, *affirmed* (6 *Cir.*) 43 *F.* 2d 119; *The Coca-Cola Co. v. Tip*

*Top Bottling Co.,*[1] *D. C. E. D. Mo.* 1927; *Fowle v. Miner's Fruit Nectar Co.,*[1] *C. C. U. S. Mass.* 1909; *Coca-Cola Co. v. Miller's, Inc.,*[1] *E. D. Va.* 1940.

In *Pepsi-Cola Company v. Coca-Cola Company, supra,* the court aptly said:

> "The plaintiff does not, and, of course, could not claim any proprietary right in the word 'cola', standing alone. None the less, it is plain that the objection of the plaintiff really goes to the registration by any other person of the word 'cola' in any combination for a soft drink. If such objection is allowed, then the plaintiff virtually becomes the possessor of an exclusive proprietary right in relation to the word 'cola'."

Substantially, the only evidence before the court was that the word "cola" had been used in numerous other registered trademarks. In view of the contention made, the court's statement might have been broader than necessary, but, when applied to the contentions and evidence in this case, it correctly defines the complainant's rights.

In *S. R. Feil Company v. John E. Robbins Company,* (7 *Cir.*) 220 *F.* 650, the court held: That the name "Sal Tone" did not infringe "Sal-Vet"; the word "Sal", meaning salt, was descriptive of the principal ingredient of both products.

In *Standard Paint Company v. Trinidad Asphalt Company* 220 *U. S.* 446, 31 *S. Ct.* 456, 55 *L. Ed.* 536 on which the *Feil case* was largely based, the court held that "Rubbero" did not infringe the name "Ruberoid". Both products were used for roofing. "Ruberoid" contained no rubber, but, because of its similar qualities, it was held to be a descriptive and generic word. See also *American Brake Shoe & Foundry Co. v. Alltex Products Corp.* (2 *Cir.*) 117 *F.* 2d 983.

The complainant company has been diligent in attempting to protect its trade-name, and has brought numerous infringement suits during the last thirty years, in many of which it was successful. *Nashville Syrup Co. v. Coca Cola Co.,* (6 *Cir.*) 215 *F.* 527, *Ann. Cas.* 1915 *B,* 358; *Coca*

---

[1] No opinion for publication.

*Cola Co. v. Old Dominion Beverage Corp.*, (4 *Cir.*) 271 *F.* 600, *certiorari* denied 256 *U.S.* 703, 41 *S. Ct.* 624, 65 *L. Ed.* 1179; *Coca-Cola Co. v. Stevenson*, (*D. C.*) 276 *F.* 1010; *Coca-Cola Co. v. Hy-Po Co.*, (*D. C.*) 1 *F. Supp.* 644; *Coca-Cola Co. v. Benjamin Duberstein*, (*D. C.*) 249 *F.* 763; *King-Kola Mfg. Co. v. Coca-Cola Co., Cust. & Pat. App.*, 99 *F.* 2*d* 983; *Corn Products Refining Co. v. Coca-Cola Co., Cust. & Pat. App.*, 103 *F.* 2*d* 385; *Steinreich v. Coca-Cola Co., Cust. & Pat. App.*, 67 *F.* 2*d* 498, 500; *Coca-Cola Co. v. Fooks*, 39 *U. S. P. Q.* 72. But these cases are not necessarily controlling. They not only involved questions of fact, but, whatever possible inferences might be drawn from the language used in some of them, none of them directly held that the complainant company had the exclusive right to use the word "cola". That fact is emphasized in *Dixi-Cola Laboratories, Inc., v. Coca-Cola Company, supra.* Nor is *Coca-Cola Company v. Chero-Cola Company,* 51 *App. D. C.* 27, 273 *F.* 755, inconsistent with my conclusion, as to the limited nature of the complainant's rights. That case grew out of proceedings opposing an application for a patent office registration, in which all reasonable inferences, were against the registration of the proposed mark. Moreover, the question was whether the whole name "Chero-Cola" was deceptively similar to "Coca-Cola".

Since the complainant company never had the exclusive right to the use of the word "Cola" alone, no question relating to the abandonment of rights is involved.

The Nehi Corporation further contends, however, that in any aspect of this case "a designation, which is initially a trade-mark or trade-name, ceases to be such when it comes to be generally understood as a generic or descriptive designation for the type of goods in connection with which it is used." *Section* 735 (1) of the *Restatement of the Law of Torts* lays down that rule.

It is said that the real problem is what the word or name means to the buying public when the infringement suit is

brought; that the probability of deception, as to the manufacturer of the product, is the sole test; and, when the word in controversy has become generic, no deception is reasonably probable. The defendant company, therefore, claims that what the public now understands by the use of the generic word "Cola" is merely the product, and not the producer, and that that word can be lawfully used by any one. This rule was applied in *Dixi-Cola Laboratories, Inc., v. Coca-Cola Company,* under what seem to be strikingly similar facts. The court conceded that the Coca-Cola Company had been diligent in attempting to protect its trade-name. It also said [117 *F.* 2d 358]:

"The adoption of the word 'cola' to characterize a class of drinks thus came about very naturally, to some extent with the consent of the Coca-Cola Company * * * and to a greater extent because in the course of events it could not be prevented."

Among other cases, the court cited *DuPont Cellophane Co. v. Waxed Products Co.,* (2 Cir.) 85 *F.* 2d 75; *Bayer Co. v. United Drug Co.,* (D. C.) 272 *F.* 505; *Kellogg Co. v. National Biscuit Co.,* 305 *U. S.* 111, 59 *S. Ct.* 109, 83 *L. Ed.* 73; *Singer Mfg. Co. v. June Mfg. Co.,* 163 *U.S.* 169, 16 *S. Ct.* 1002, 41 *L. Ed.* 118; *Ford v. Foster,* [1872] *L. R.* 7 *Ch. App.* 611.

On the other hand, the complainant company claims that no such rule should be applied when the original validity of a trade-name is conceded, and when the original user has been diligent in endeavoring to protect its rights. *Saxlehner v. Eisner & Mendelson Co.,* 179 *U.S.* 19, 21 *S. Ct.* 7, 45 *L. Ed.* 60; but see *Saxlehner v. Wagner,* 216 *U.S.* 375, 30 *S. Ct.* 298, 54 *L. Ed.* 525. It further claims that to hold otherwise would, necessarily, make the rights of the parties depend on the number of unlawful and unfair acts that had been committed by competitors; that ordinarily such evidence should not appeal to a court of equity (*Ford v. Foster*), and that, in all of the cases cited in the *Dixi-Cola* case, some measure of relief was granted. Moreover, in all of those

cases the courts are said to have misunderstood *Ford v. Foster*. If "Cola" were merely a coined word, it would not be necessary to rely entirely on other alleged piratical and unfair acts in the use of similar trade-names; but it is unnecessary for me to determine the scope of the *Restatement* rule.

Conceding that the Nehi Corporation is attempting to profit by the known popularity of cola beverages, including Coca-Cola, that, in itself, is not unlawful. *Saxlehner v. Wagner*, 216 *U.S.* 375, 30 *S. Ct.* 298, 54 *L. Ed.* 525; *Coca-Cola Co. v. Carlisle Bottling Co.*, (*D. C.*) 43 *F. 2d* 101, *affirmed* (6 Cir.) 43 *F. 2d* 119. Whether the defendant is guilty of trade-name infringement is the question.

Thirteen witnesses, from the City of Wilmington, testified that the word "cola" meant to them a product of the Coca-Cola Company; they were under the impression that Royal Crown Cola, though sold in a much larger and a different type of bottle, was a very different trade-name label, was merely a cheaper product of the complainant company. But I do not believe that any material portion of the public can now think the word "Cola" necessarily means "Coca-Cola," or a product of that company. The evidence given can hardly rebut the defendant's evidence as to the descriptive and generic nature of that word. *Dixi-Cola Laboratories, Inc., v. Coca-Cola Co., supra.* Nor are the complainant's word association tests of any greater value in this case. Naturally, the word "cola," merely printed on a card, would cause many persons to think first of Coca-Cola. It is the most popular and extensively advertised cola drink on the market; but in determining whether there is trade-name infringement, many other existing factors must be considered. The questions were put to a group of college students, who were not subject to cross-examination; furthermore their familiarity, or lack of familiarity, with other cola drinks was neither asserted nor denied.

When read as a whole, neither of the names "Royal

Crown Cola," "Royal Crown RC Cola," "RC Cola," "Nehi Cola," nor "Par-T-Pak Cola" is deceptively similar to "Cola-Cola." They are not spelled alike, and when pronounced, do not sound alike. That is the real question to be determined. In principle, the same conclusion was reached by the Supreme Court of Canada in *Pepsi-Cola Company v. Coca-Cola Company, supra*. There, the question was whether the trade-name "Pepsi-Cola" was deceptively similar to "Coca-Cola." The lower court held that it was, but was reversed on appeal.

Proof of an actual fraudulent intent to deceive, in order to profit by the prior established trade-name of a competitor, is not essential to trade-name infringement (*Enoch Morgan's Sons Co. v. Ward*, [7 Cir.] 152 *F*. 690, 12 *L. R. A*, (*N. S.*) 729; *Restatement of the Law of Torts*, § 729) ; but, when satisfactorily proved, it may be important in some cases in determining whether the defendant is guilty of the wrongful act charged. *Enoch Morgan's Sons Co. v. Ward, supra; Restatement of the Law of Torts, supra*. The commission of other and accompanying acts of unfair business competition may also be pertinent and important evidence. Evidence of actual confusion, because of the alleged similarity of the names used, may likewise be of some importance in determining whether there is trade-mark infringement. 63 *C. J.* 396; *American Tin Plate Co. v. Licking Roller Mill Co., (C. C.)* 158 *F*. 690; *Kann v. Diamond Steel Co.*, (8 Cir.) 89 *F*. 706. But the application of these rules to characterize and explain the use of a particular trade-name, necessarily depends on the facts.

The complainant company claims that, in view of the evidence, these principles should control the decision of this case; that it shows that the defendant's use of the word "Cola" in its trade-names is clearly deceptive and unlawful and should be enjoined. I am unable to agree with that contention. The Coca-Cola Company necessarily concedes, that ordinarily "the product including the coloring matter is free to all who can make it if no extrinsic deceiving ele-

ment is present." *Coca-Cola Co. v. Koke Co.*, 254 *U.S.* 143, 41 *S. Ct.* 113, 114, 65 *L. Ed.* 189; see, also, *Coca-Cola Co. v. Williamsburg Stopper Co.*, 1912, 2 *T. M. R.* 234. The Supreme Court apparently referred to the type of drinks known as "Cola drinks"; the evidence before it compels that conclusion.

Particularly, when sold by the glass, the complainant company contends, however, that the similarity in the color of the defendant's drinks to Coca-Cola is an ever-present assurance that they can be fraudulently passed off for that beverage. Other alleged acts of unfair business competition are also said to corroborate the complainant's primary claim. But the proven fact that Royal Crown Cola has been fraudulently passed off for Coca-Cola in numerous cases is, apparently, the real foundation on which this argument is based.

The evidence does show that when Coca-Cola was ordered in taverns in various Western cities, and was to be served by the glass, that Royal Crown Cola was repeatedly substituted therefor; in some cases this was suggested to the bartenders by agents of the Nehi Corporation, engaged in promoting the sale of that product. These suggestions were based on the asserted fact that a bottle of Royal Crown Cola contained twice as much as a bottle of Coca-Cola, and could, therefore, be profitably passed off on customers ordering the latter drink. But it clearly appears that such acts were committed by over-zealous agents of the defendant company, and without the knowledge or consent of any officer or other person of authority. See *Coca-Cola Co. v. Happiness Candy Stores, Inc.*, 19 *Del. Ch.* 292, 167 *A.* 900; *s. c. on appeal*, 20 *Del. Ch.* 456, 180 *A.* 927. Furthermore, the tavern trade constituted but a small part of the defendant's extensive business. Perhaps, some slight confusion is always possible when words of a generic or descriptive nature are used in trade-names. *Bliss, Fabyan & Co. v. Ailween Mills, Inc.*, (4 *Cir.*) 25 *F. 2d* 370. The fraudulent passing off of one product for another is reprehensible, and, independent of any

inferences that may be drawn therefrom, will be frequently enjoined. But, particularly in the absence of any knowledge on the part of the defendant, such acts do not necessarily justify the inference that a known word, originally in some measure descriptive, but which has now become generic, is being used for deceptive and piratical purposes. See *Dixi-Cola Laboratories, Inc., v. Coca-Cola Co., supra;* see, also, *Coca-Cola Co. v. Happiness Candy Stores, supra.* Standing alone, all other alleged fraudulent acts are relatively unimportant to the main issue. Conceding that an average twelve ounce bottle of Royal Crown Cola contains only about 52/100ths of a drop of the cola nut extract, the use of the word "Cola" is not so deceptive as to affect the main issue, when a known class of drinks is involved. The caffeine properties of the cola nut are supplied by proper substitutes. See *Standard Paint Co. v. Trinidad Asphalt Co., supra.* Neither *Trappey v. McIlhenney, Co.,* (5 *Cir.*) 281 *F.* 23, *Siegert v. Gandolfi,* (2 *Cir.*) 149 *F.* 100, nor *O'Cedar Corporation v. F. W. Woolworth Company,* (7 Cir.) 66 *F. 2d* 363, is inconsistent with this conclusion.

Long ago, the complainant company admitted that the public recognized that there was a type or class of beverages known as "cola drinks"; that Coca-Cola was the prototype of that class, and contained but a small amount of the cola nut extract, though it had its properties. The testimony of other witnesses that a beverage could be classed as a "cola drink", if it had the usual characteristic taste and color, though it contained little or no extract of the cola nut, is, therefore, both understandable and pertinent.

The alleged fraudulent failure of the defendant company to give the name of the manufacturer or distributor of Royal Crown Cola in broadcasts and other advertisements is not clearly proved, and is of no material importance. The same is likewise true of the alleged fraudulent intent to profit by copying the advertising color schemes which had previously been adopted by the Coca-Cola Company on road-

side and other signs. Some newspapers and other advertisements of Royal Crown Cola and some broadcasts and signs might have failed to disclose the name of the manufacturer or distributor of the defendant's drinks; but these instances were relatively few, and the names "Royal Crown Cola," "Royal Crown RC Cola," or "RC Cola" always appeared. Furthermore, only a few primary colors are ordinarily used on roadside and other signs for advertising purposes; the colors used by the Nehi Corporation in that class, were, in fact, suggested by their advertising agent, and were adopted without any fraudulent intent.

There are cases in which the use of a trade-name has been held to be deceptive in transactions with the public, and has been enjoined, though the complainant was entitled to no such relief in transactions between the defendant and the trade. *Bayer Co. v. United Drug Co., supra; Ford v. Foster, supra.* But the evidence in this case does not even justify the application of that rule.

The bill of complainant will, therefore, be dismissed, and a decree entered accordingly.